Good afternoon. The first case is 06-1496, Link, v. Intertape. Mr. Roberts, is that Link or Link Q or what? Link. Good afternoon. My name is John Roberts and I'm here representing Intertape Polymer Corp. and the Intertape Polymer Management Corp. with me is my co-counsel Sean Wertheimer. We're here to ask the Court's assistance today to interpret the claims of the Link patents and interpret them in a fairly narrow fashion. We say this because of the specifications of the various Link patents as well as the file history and prosecution histories associated with them. Mr. Roberts, I noticed you raised, by my count, 13 issues that somehow warrant our intervention. Which of these 13 issues is the most important issue? Which is your best case? Our best case is on claim interpretation, Your Honor, and secondly, on issues related to Link. Usually when we see that many issues, that suggests that maybe this is sort of grabbing at straws. It's unusual that the district courts make that many mistakes. I see, Your Honor. That's not the case at all. There were a number of cases, a number of issues that seemed to flow from the claim construction. So I'd like to focus today on the claim construction and draw the Court's attention in that area. I think some of the other things will become clear as we go. Now, with respect to the claim construction issues that we raised, we're advocating for fairly narrow claim construction. Specifically that the claim, this so-called quasi-conductive fiber, that it be made up of, that it is in fact filaments, meaning a bunch of very narrow pieces that go together to make up a fiber. And that that fiber has a specific structure, specifically being that it is a conductive core and not conductive sheath, because that is the limitation of the embodiments that we're giving. Now, to be sure, there is a second embodiment, if you will, in the later patents, in what's called the 449 and 772. And let me point out at the outset, just for familiarity, on Board Number 1 is the difference between the two fibers, excuse me, the two filaments that are used. The link filament is a long, continuous filament that has a black, that black trilobal core surrounded by an insulated sheath. Whereas the inner tape filament is a very short, what's called stable fiber, much like you would have when you weave pieces of wool together to come out with a long piece of thread. And what then happens with the link filament is that they take six of them together and then that's used to subsequently create a fiber that's woven into their fabric. That's all the disclosure that they get. The one other embodiment that they present is an embodiment that they specifically disclaimed during the course of their prosecution of these various patents. And so we suggest, unfortunately, that that embodiment, which is in the specification, is something that has been ruled out by links on the prosecution history. So tell me specifically, I'm assuming you're referring to Column 4, 1.4 patent? In the- Where they describe, firstly, the Brooklyn embodiment. And the argument seems to be, in the next sentence, which talks about other configurations, right? They say other configurations. So they specifically say that. So you're saying it's not with Siemian that they specifically outlined that in the spec. The prosecution history dictates that way. Yes, Your Honor. In fact, what they say about other configurations relates to the core itself. You see a trilobal core there. They mention, for example, that other cores can be either more or less uniform, but all of which is surrounded by a sheath. And that sheath is non-conductive or insulated sheath. So in the 154, they limit their structure to a sheath core structure. And there's really nothing else that is shown or described there. Now, as further evidence of this, during the course of the prosecution of the applications, they have specifically stated a number of things. One is that they were confronted with some other fibers, one of which was described in the 699 patent to Mr. Pappas, who happened to be the same inventor associated with these later patents. And that particular fiber was a fiber that had a conductive sheath and a non-conductive core. And Link repeatedly, in all of the prosecution histories, repeatedly said, this new technology is what we've designed to improve over. And then they went on to say multiple times during the course of the prosecution history that those fibers were conductive in nature and we, Link, are not going after conductive fibers. Now, in contrast, of course, Link is trying to expand the claim in a broader fashion to cover the fiber that Intertape has, which is not a sheath core construction in any way at all. Now, to compound this and to also give the court further confidence that a narrow construction of the claim should be given, Link repeatedly, again, in all of the applications, noted that this was unpredictable subject matter. And they presented an affidavit of Mr. Pappas, the inventor, to support that position, that the results were unexpected, that it was unpredictable, that the fabric arts were unpredictable, and that his specific, what he referred to as his novel fabric, comprised what was on board number two, which is the six of these strands, these filaments, which incidentally were something called negastat. Six of those negastat filaments wound together with certain other pieces of other filaments to make a stronger fiber. And he said in the course of all this, and was echoed by the applicants in all of their file histories, that this was unpredictable, that these were unexpected results, and where an applicant makes that unpredictability argument and also notes that this differentiates from the prior art, this is a situation where you can import limitations into the claims because of the way the applicant went forward with their, with the ability to get their claims allowed. So, with that kind of construction, we submit that that's the appropriate construction, and what the court erred, to answer Judgment's question earlier, where the court erred in their construction is they gave a more expansive definition to this particular quasi-conductive fiber. They said things like it relates to, staple fibers can come within the bounds of the particular, of the definition of this particular one of the claims. Well, what construction did you, this was in connection with the court's construction of the term filaments? Well, that's correct, with respect to filaments, right? Right. What construction did you advocate? We advocated, with respect to filaments, that the filaments, first of all, all of which would have to have a quasi-conductive capability, that filaments that had other things other than, for example, these non-supporting filaments, that that really didn't count. The fiber that they were talking about was conducted of filaments of this quasi-conductive negastat fiber, the sheet core construction, and that's all of what's conducted, that's all that was really supposed to be in the filament construction. What I had a hard time finding in the records, and maybe you can point me to it, is where I know, I didn't find that we were objective to the special master, the construction of that term was the one which the district court ultimately accepted. That's right. And I couldn't find, or maybe the other side said, that you didn't object to the special master's construction before the district court. No, in fact we did. We objected in the memo on claim construction, for example, we objected to the special master's report at A6547. We had a memo on claim construction espousing our particular construction of the claim at A1811. And so it's not true that we didn't object. So these were objections made to the special master's report to the district court. That's right. And filaments was not the only thing that we were objecting to. One of the other issues with respect to filaments that we espouse today as well, is that these are continuous filaments that are being used. The reason we say this is that all that was disclosed by Link, in all three of the applications, is a particular fiber called a P190 fiber, which is a conductive core, non-conductive sheath fiber made by DuPont at the time, though another company happens to make it. And this was the only filament that was disclosed by Link, that was discussed by Link. And in the context of looking at other prior art, Link continued to emphasize to the patent office to have the claims allowed, that no, this other prior art doesn't count, because not only are we different where the quasi-conductive and the others aren't, but we also are different because we got these unexpected results. And the patent office looked at that and said, well, okay, you've made your case for unexpected results, and these other fibers really don't count. Link also said during the course of their prosecution,  in a quasi-conductive fashion. So here we are, as Intertape, coming in with a filament that's completely different. A structure, if you look at board number three, which is a completely different theory of how the structure goes together. Unlike Link's case, where they use these continuous fibers, and that's all that was disclosed. What it is that Intertape does is they take a combination of these stable fibers, which are very short, cut-off fibers, they have surface-conducting elements, and surface conductors, the surface-conducting aspect of things, is something that Link disclaimed. So we use those. They're not in a continuous form. They're made in a particular ratio. And with this unexpected nature of all of this sort of thing, Link cannot now come to this court, and we submit that was the difficulty with the district court below, and say, well, our fiber now covers this totally different kind of structure, where you have continuous fibers, and you have something that's completely different, where the fibers are conductive on the surface. In fact, one of the things that's important to note is that the stable fiber aspect of things. Stable fiber was not something that Link ever thought about. It was not in their specifications. It was not in their file history. The first time it came up was when Link suggested it as a consequence of the Clay construction that went on in this litigation. And we submit that that also shows that, frankly, the claim was being construed in view of the accused device, and that's something that this court is, of course, warned against doing. So for a variety of reasons, we submit that the Clay construction with respect to including stable fibers was an error, that the Clay construction that did not include continuous fiber in the chief court was an error. And as a consequence, if the court deems to adopt the structure that we are espousing today, there is no way, in fact, that Intertate will wind up infringing any of those claims. Now, a subsequent issue... Mr. Roberts, excuse me. Yes, sir. A moment ago, you made a statement in response to Judge Prost's question that you objected to the special master's construction of filaments. You referred to Appendix 65-47. That to me looks like your objection to the construction of the other phrase in Claim 1 related to plurality of clays that end up in fibers having normal discharge points, but not the Clay limitation relating to filaments. The corroded discharge, that is certainly one aspect, but I think... Forgive me. On 65-47, we say in the Intertate construction, we talk about two or more continuous filaments having a conductive component size and shape. That's your proposed construction? That's correct. This limitation of plurality of clays that end up in fibers having corona discharge points. Yes, sir. Was there an objection to the construction of the filaments limitation of the claim? Yes. Right above that, where it says the special master's recommendation is that filaments are sized and shaped, and we're saying that the two or more filaments have to have, among other things, have to have these conductive portions associated with them. I'm still confused. This section of the objection starts out referencing 154 patent Claim 1, quote, and then you quote a limitation from the claim. Correct. And then you have under that the special master's recommendation of what that should mean, and then you have your construction. That's correct. So this all relates to that limitation, the quoted limitation. That's not the limitation of filaments in the claim. That's the limitation on quasi-conductive fibers. Well, Your Honor, if in that— Was there a separate construction of filaments when it was made by the special master? The special master did make—did he make a construction of filaments? He did. I can't quote exactly where at this very second, but if you look at our objection, our construction, we talk about the filaments being continuous, and we submit that's— even if he made another—a finding of that, our objection was, or our proposed finding, was that it be continuous filaments, and that's—that was the difference between— that would get us away from the finding that the special master did that staple fibers was included in there. We had always objected to that. So it seems to be a rather indirect challenge to this limitation of this theory, because there is a separate limitation in the claim that talks about set filaments, separate from the quasi-conductive fibers. Right, and in any case, with respect to any of those filaments, it's our submission to the court and to the district court below that those filaments had to be, because of the unpredictable nature of things and all the statements made and disclaimers made, that those had to be continuous in nature, which is what we're saying here. Yes. And I'll observe whatever little time I have left for a follow-up. Well, we'll give it to you before we go. Thank you. Thank you. Thank you. So if you need a couple extra minutes, you may have it as well. Okay. I hope not to use it. If you could just give us a moment to get— Chuck, which one do you need? I'm going to put them both up here. Wherever. Okay. Okay. Want it together? Thanks, Chuck. Thanks, Chuck. So why is Mr. Roberts incorrect in his description of the prosecution history here? And how does it relate to what, in fact, he's intending to prove in the past? Sure. The issue that occurred in the prosecution history was the citation to the 699 patent. Mr. Roberts got that part correct, which is a patent that actually is discussed in the prior art section of the 154 patent. What we said in the prosecution history was exactly what we said in the specification of the 154 patent, that conductive fibers are the old art because they didn't use resistance to try to avoid an incendiary discharge. We said that in the specification. We repeated it in the prosecution history. Never once, never once in the prosecution history did we say that the 699 patent was a conductive fiber because it had conductors on the outside as opposed to conductors on the inside. It was never said because that was never the point. The point was simply, as we had said in the specification, that old conductive fibers didn't use resistance to try to avoid an incendiary discharge. That was the only point that we made to distinguish the 699 patent. It had nothing to do with the specific construction of any fiber. You notice Mr. Roberts never said a word about the construction of fiber. He couldn't because it's simply not in the prosecution history. In effect, very interested in the exact same response to an office action where we distinguished the 699 patent, we said in describing what the quasi-conductive fiber is, we said quasi-conductive fibers may take many different forms. However, all embodiments are sized and shaped to have resistance to avoid incendiary discharge in a combustible environment and to affect corona discharge at the filament ends and at the other discharge points. So we reiterated the breadth of what a quasi-conductive fiber is in the same response where we said we're not a 699 patent because we use resistance to avoid incendiary discharge. Something that had just simply never been taught in the prior article, which again, is exactly what we said in the specification. This, of course, is the probably principal issue that is involved in the appeal. And I sympathize with Judge Lindley. I had the same issue when they read their brief. There were so many to respond to. I believe our brief responds to their arguments. So I do want to concentrate on the quasi-conductive fiber interpretation question because I do think it is the most important question. Let me ask you about the filaments. Yes. Was there an objection to the interpretation of filaments? No. And what happened in the special master's report, he interpreted quasi-conductive fiber. And then he went on, as you just said, at pages 837-51 to 3755. He then went on to give an interpretation of filaments. And that's where he said it was a thin strand or fiber. And he explained why that was appropriate. And in the course of that, he said, because you can get the breaks in the prosecution history teaching, you can get breaks in places other than at the end and so forth, that it could include a state of fire. And there was no objection? And there was no objection to that. They did do an objection, of course, to quasi-conductive fibers. But they never submitted an objection to the findings of the special master's on filaments, which was, of course, the point we made in our brief. As to why they weighed any arguments with respect to filaments before this point. It just simply wasn't there. You made reference to the part of the record where they objected to quasi-conductive fiber. That's true. But then the other finding on filaments that Mr. Rubin made, there's no objection to. And we submit that that is the case. But Mr. Roberts argues that, well, in connection with the quasi-conductive fiber, there was a discussion about filaments. Well, actually, there was no discussion about filaments. What there was is in his proposed construction that you read, it does use the word continuous filaments. That's correct. But if you read what he says afterwards there, what Ayrton said afterwards, there's not a word about the filaments issue. So the word appears if part of an objection is something else. But there's absolutely no argumentation presented on filaments. In fact, very interesting, one of the things that makes this intertapes argument a little bit like trying to hold water, if one even looks at their interpretation of quasi-conductive fiber that they put before the judge in objection to the special master, it's not the same one that they're espousing in this court. There they said it just has to have some conductive element. This argument today that it's limited to the insulative chief and the conductive court is on the appeal. It is not what they said when they objected to the special master. But getting back to the major issue on quasi-conductive fiber, we're all, of course, familiar with the rule that, as a general matter, we're not supposed to limit claims to a specific preferred environment. And while intertape uses a disclaimer argument and they wrap it up in some 112 arguments, at the end of the day, that's exactly what they're asking this court to do. They're asking just to limit this to the one preferred environment. It's wrong as a matter of law, the way to approach it. And more specifically, it's wrong as a matter of fact. Judge Prost, I believe in one of your questions you referred to part of the specification where we specifically referred to the fact that there could be many other configurations. It wasn't, by the way, just talking about the court. It was talking about the different kinds of materials that could be used. And if I may read briefly one other part of the specification, this is from the 154 package, excuse me, the 449 package, where we say, while certain combinations have been illustrated herein for the quasi-conductor fiber of the invention, there could be other configurations which include components of conductive, quasi-conductive, and non-conductive materials that would fall within the scope of the invention. I submit this court has said many times that you should not limit to the preferred embodiment unless the inventors made it clear that's all they intended to cover. These statements that we've talked about from the specification, these statements that we've talked about from the prosecution history, couldn't have been clearer that this was screaming out the intent of the inventors that we're not limited to any one specific embodiment, but rather this was a concept, a concept which Mr. Rubin and the district court fully understood that we were teaching in the specification, where we taught that you needed to have some conductivity to be able to get the corona discharged, to discharge the charge on the FIDC, but that we had to have higher resistance, magnitudes of higher resistance to prevent the incendiary discharge. It was really, it was all laid out in the patent, what it is, what the principles are. The insulated sheet of conductive core was an example, but we went on to say that it's not limited to that or any other specific example. As I read earlier from the prosecution history, what they all have in common is the corona discharge and using the resistance to avoid the incendiary discharge. They're not even right, of course, about the figures, as he admitted, because one of the figures in the patent has the conductive portion on the outside and the insulated portion in the core. And knowing that I can't make his argument, that's where they come up with the disclaimer. But as I believe I said, Your Honor, we never ever distinguished on the basis of the specific configuration of the fiber. Quite the opposite. It was all on the basis of resistance and that's where we went. If I could just spend a moment, I think just to sum up on the quasi-conductive fiber issue, plain intent by the inventors not to limit it to a specific embodiment, no disclaimer from the prosecution history. In fact, reassertion from the prosecution history that we should have the broader interpretation. As I mentioned at the beginning, Intertate does in their papers, at least, try to wrap this up all in a bunch of 112 issues which themselves are put together. I don't want to spend a lot of time. We can answer all of those in the brief. I'm not sure which ones they're talking about. But just, it can't be any of the 112 issues. It certainly can't be indefiniteness. After all, everyone's offered interpretations. Insolubly ambiguous is the legal term. Plainly, that's not meant. Written description, they didn't even put forward the trial. They withdrew it at trial. That would be the end of it anyway. And of course, with all this teaching of the patent, there's no question that the inventors had possession of the invention at the time that the filings were made. And as far as enablement... So they're not ruling by the district court on the written description? No, they withdrew it. They withdrew the argument at trial. They were entitled to go forward with that. And with respect to enablement... There was some confusion, was there not, in terms of what the district court was ruling on and what it was ruling on? At the end of the day, I don't think that there actually was. There was a motion in Limine that came up right before trial, and the judge made clear that he had ruled on the enablement issues. He had not ruled on the written description issue. He had not ruled on the best mode issue. That's why written description and best mode went forward to the jury. But the district court adopted the special master's... On claim interpretation. Right. That's correct. The special master did not opine on enablement, correct? No, that was the subject of summary judgment. That's correct. He did not... In fact, he said, I'm not opining on enablement or any of the 112 issues, but they were raised during the summary judgment proceedings, and in the Limine motion, the district court made clear he'd heard all the evidence on enablement, some of which overlapped, of course, on the claim construction. And he used much of what the special master had said about claim construction, because it's many of the same reasons why it's enabled. The teachings are there, the examples are there, and therefore he concluded, and we submit correctly so, based on the record, that there was obviously an enabling disclosure there. Yeah, but at what stage did he conclude that? I mean, it was the summary judgment, and then there was the motion to eliminate. That's correct. And the motion to eliminate kind of said, well, I already decided that in the summary judgment. That's right, because he had all the evidence before him. I mean, it is true that... Before he met in the summary judgment. Are we talking summary judgment time? In the summary judgment. That's correct. It was all before him. You know, the motion to eliminate is interesting because Intertape argues, well, they could have put all this evidence before the jury. There's nothing before the jury because enablement is an issue of law. All the evidence that they allegedly couldn't put in had already been put into the record, and the judge had looked at all of that and had decided, and we submit correctly so, that there was no need for anything more on that because they had... Their plaintiff was in enabling disclosure. The teachings under the standards of this court, the teachings were there. Specific examples were there of how to do it. The characteristics of the specific examples were there. All the things that this court tradition looks at on enablement, they were all there, and consequently, we believe that, certainly by the limiting motion, when he recognized that, yes, he had decided enablement, he didn't need to hear any more, that, in fact, there was an enablement disclosure of these pacts. I thank the court. If there's any more questions, frankly, I was able to do it in less than the time allotted, and I give it back. Thank you. Thank you, Your Honor. I think we must be looking at completely different final histories. The final history that Link is saying there were no disclaimers on, for example, if you go to 5437, and let me just quote from that, this is Link saying about their fiber to differentiate it from others. While there may be many known, quote, anti-static fibers, it is not predictable that any particular anti-static fiber would be less or more useful in preventing incendiary discharge. And then they go on to say what they are submitting, which is this mega-stat fiber, is, in fact, unpredictable. So, first of all, to say that any fiber will work, as you're now hearing, is something that, in front of the patent office, to get their claims allowed, was something they said not any fiber will do. Was the predictable or unpredictable nature of this art an issue that you raised in the district court? Yes. Yes. In fact, we elicited commentary from one of the embedders, Mr. Pappas, to ask him about that. We confronted him with respect to his declaration. We elicited testimony from him to say, reinforcing the fact that you signed this, you wrote this is unpredictable technology. In fact, yes, it was brought up. And that's another reason, as we say, in addition to the other disclaimers. One of the other things that's important to note as well is that the very fiber, to add confusion to all of this, the very fiber that Link uses, which is the Megastat fiber, they specifically told the patent office was no good and would not work. So, the whole file history of all of this is just replete with confusion on the part of Link. Now, one other issue that I would like to raise with respect to the whole issue of 112 is the issue that we talked about with respect to the Bessimo. We asserted that there was a Bessimo in all of this, and this will be the only other issue I'll raise today. And it's clear that the inventors had a Bessimo about practicing the invention, and that was what was described in... We didn't get into the Bessimo in either of the prior two arguments, so I think we need to close this down if this was your last argument. They wouldn't have an opportunity to respond to it, would they? They wouldn't, and it's in the brief. Yes, it is. Thank you very much. All right, thank you.